HARRY GREENBERG, appellee, v. ALTER COMPANY, an Iowa corporation, appellant.

No. 50632.

(Reported in 124 N.W.2d 438)

NOVEMBER 12, 1963.

Margaret Stevenson, Lambach, Shorey & Plath, of Davenport, for appellant.

Doerr, Dower & Rehling, of Davenport, for appellee.

THORNTON, J.—Plaintiff and defendant, Alter Company, a corporation, entered into a joint venture in June of 1950 to purchase steel landing mats from the General Services Administration. The intention of course was to resell the same at a profit. Approximately $117,000 was paid for 4600 tons of steel landing mats. From June 1950 to May 25, 1953, approximately 1300 tons of the mats were disposed of by the joint venturers for about $99,000. It was then agreed in writing by the parties to dissolve the joint venture and liquidate the remaining mats, about 3300 tons, by a public auction sale to be held June 12, 1953, at the place of business of the Alter Company in Davenport. Defendant, Alter Company, purchased the remaining mats for $30 per ton or approximately $99,000.

Plaintiff's action is in two counts, the first to set aside the sale and defendant be made to account for the sums received for the mats defendant obtained at the sale or for the return of the mats. By amendment at the close of the evidence plaintiff asked for general equitable relief. Under this amendment plaintiff

urges the defendant, because of the relation of joint venturers, stood in a fiduciary capacity and could not purchase at the auction sale without full disclosure, and the burden is on defendant to show the sale and price paid were fair and reasonable, and that it is entitled to judgment for the value of the mats placed at $65 per ton by Mr. Greenberg in his testimony. In the second count plaintiff asked a general accounting of funds of the joint venture and for general equitable relief.

The trial court corrected the accounting to date of the auction sale, set aside the sale on the grounds of mistake or misunderstanding of the term "cash" as it appeared in the dissolution agreement, and ordered the defendant to account for the mats received at the auction sale.

Defendant for reversal urges the sale was held and conducted in accordance with the dissolution agreement and plaintiff is guilty of laches. Plaintiff seeks to sustain the setting aside of the sale on the theory of a fiduciary relation and in its cross-appeal urges the court erred in allowing certain expenses, in ordering further accounting, and failing to enter judgment for plaintiff for the value of the mats.

I. The fiduciary relation between the parties as claimed by plaintiff has a pleading weakness as urged by defendant, in that this theory of recovery was not disclosed by the pleadings at least until the amendment at the close of the evidence. We think, however, the better answer to plaintiff's claim of fiduciary relation and the consequent burdens and duties cast on defendant is that it is inapplicable to the dissolution sale before us. There is no question but joint venturers, like partners, owe the duty of finest loyalty and such loyalty continues throughout the life of the venture and its dissolution. Johanik v. Des Moines Drug Co., 235 Iowa 679, 685, 17 N.W.2d 385; Goss v. Lanin, 170 Iowa 57, 65, 152 N.W. 43; and Joseph v. Mangos, 192 Iowa 729, 732, 185 N.W. 464. But here the reason for holding one joint venturer in a fiduciary or agency relation ceases. This is not a sale made by one joint venturer to himself of which his partner has no knowledge or incomplete knowledge or the purchaser is better informed than his partner. Here plaintiff and defendant had been trying to dispose of these landing mats

for three years. Each had been selling and according to the evidence each had been exerting great effort to effect more sales. They agreed in writing to dissolve the venture and dispose of the mats at public auction. It is true this agreement was more or less at the insistence of defendant, but plaintiff did so agree and took part in the sale. The evidence shows defendant disposed of the mats after the sale in much the same way as plaintiff and defendant had and finally disposed of the remaining mats as scrap metal, thus showing no profitable knowledge on his part unknown to plaintiff.

However, our decision does not rest there, but on the ground this was a public sale authorized by the joint venturers with the intention on the part of both to dispose of the property as joint venture property, and conducted by an auctioneer and clerk hired by both. It is similar to a sale by a trustee for the benefit of creditors, of partnership assets, Johnson v. Bruzek, 142 Minn. 454, 172 N.W. 700, 701, or a sale by the personal representative of a deceased partner to a surviving partner, Valentine v. Wysor, 123 Ind. 47, 23 N.E. 1076, 1079, 7 L. R. A. 788. Such a sale may be questioned only for fraud or collusion.

II. This leads to the principal question, was the sale conducted in accordance with the dissolution agreement? If it was, plaintiff has no complaint; if it was not and he was thereby damaged, he is entitled to relief.

The trial court held there was a misunderstanding as to the meaning of the term "cash", that the parties understood it differently. And the effect of the requirement of cash payment prevented a competitive sale.

The dissolution agreement provided for the public auction sale at the Alter Company in Davenport where the mats were located, all sales shall be for cash, that the sale was to be conducted by representatives of both parties, or if they agree, by a disinterested person selected by them, and clerked by a Davenport bank. Paragraph 6 provided the bidder shall deposit with Davenport Bank & Trust Company (bank selected as clerk), "to be held in escrow pending his withdrawal of whatever quantity of such landing mats the bidder may have purchased. The bidder shall remove on a first come, first served basis the quan-

tity of mats purchased, within thirty (30) days from the date of sale and in so doing shall effect such removal so as not to interfere with the ordinary operations of the Alter Company."

Paragraph 8 provided the purchasers should as they remove mats deliver to Alter Company a receipt showing tonnage, and the bank, upon Alter Company producing such receipt, release to Alter Company the funds to cover the purchase price of quantity received. It further provides if the mats are not removed within 30 days, the sale shall be deemed completed and title to have passed and Alter Company shall be entitled to the purchase price from the bank, and in the event the purchaser was prevented from removing the mats because of circumstances under the control of Alter Company such purchaser could notify the bank and the funds would then be released only after notice to the purchaser and bank by Alter Company that the mats were ready for delivery.

▪ In interpreting a contract words should be given their plain ordinary meaning and interpreted in the context in which used. The entire contract is to be considered to determine the meaning of each part. A clause or sentence is not assumed to have no effect when it can have reasonable intendment. Mallinger v. State Farm Mutual Automobile Insurance Co., 253 Iowa 222, 233, 111 N.W.2d 647, 653; Nylander v. Nylander, 221 Iowa 1358, 1360, 268 N.W. 7; Hubbard v. Marsh, 241 Iowa 163, 166–168, 40 N.W.2d 488; 17A C. J. S., Contracts, section 297, pages 107–128, and section 301, pages 142–147; 12 Am. Jur., Contracts, section 236, pages 758–762, and section 241, pages 772–776.

▪ The term "cash" is the antonym of credit. 6 Words and Phrases 247. It, of course, includes coins and currency and we think properly includes a cashier's check, a primary obligation of the bank, and a certified check, recognized by the bank as an appropriation of the amount specified therein to the named payee. 1963 Pocket Part, 6 Words and Phrases 94, 99, 164. Plaintiff testified, "* * * the sale was advertised for cash or certified check." The language used in paragraphs 6 and 8 shows a clear intent the amount of the bid be placed in escrow prior to the time of the removal of the mats by the bidder. Certainly

these provisions for deposit in escrow and use of receipts for Alter Company to obtain the funds from the bank were wholly unnecessary if the purchase price was to be paid on the day of delivery. The only reasonable time for deposit of the amount of a bid was at the sale.

The evidence for both parties shows the terms of the auction sale were announced. The announcement contained a provision requiring cash or certified check to be paid at the time of sale. Both parties agree on this and that Mr. Greenberg complained about the terms as announced. Plaintiff's evidence shows the announcement also contained a provision that if a bidder did not meet the condition of cash or a certified check the mats would be resold and the bidder held for the loss in the two bids. Mr. Greenberg testified on this phase of the sale as follows: "* * * and anyone who bid on a lot of mats and didn't meet these conditions, the mats would be resold and the bidder held for the difference in the loss in the two bids. As soon as they bid the lot of mats they would have to sign that stipulation. They had a bunch of papers written out in the office in advance that I knew nothing about. I had never seen it done in my life at any sale. Whoever bid on these mats would have to sign this stipulation to meet the conditions of the sale, cash or certified check."

In this regard the evidence is in sharp dispute. The trial court made no separate finding on this. The best that can be said is the evidence is in equipoise. Therefore plaintiff has not carried the burden of proof by a preponderance of the evidence.

In this state of the record we hold the announcement of the terms of the sale was in accord with the terms of the dissolution agreement and the sale was so conducted.

The only two bidders were Mr. Greenberg and Mr. Alter for Alter Company. There were a number of others there representing metal companies. None of these persons bid. There is no way to determine why they did not bid. Perhaps it was the spectacle of the partners bidding against one another, perhaps it was the price, or even the terms of sale. It seems highly unlikely some or all of them could not have arranged their finances if the merchandise was what they wanted. One factor

appearing in the evidence that gives credence to the theory they did not like the merchandise or the price is that none of them appears as purchaser in the list of sales made by Alter Company subsequent to the auction.

Also we do not find plaintiff has proved damages in that there is no evidence of the value of the steel landing mats at wholesale or auction other than the price bid by defendant. The sale contemplated by the dissolution agreement was a disposition of the entire 3300 tons. Paragraph 3 provides in part, "such offering to be first in broken lots, and second en masse, and such mats shall be sold under that offering, which will produce the greatest total bid for the lot." There was no evidence of the reasonable value at wholesale, auction or in large lots. The only evidence was of the price paid by purchasers of small lots both prior and subsequent to the auction. From the record these sales were for use and not for resale. They are not comparable sales. As having some bearing, see Iowa Development Co. v. Iowa State Highway Commission, 252 Iowa 978, 108 N.W.2d 487; and Redfield v. Iowa State Highway Commission, 252 Iowa 1256, 110 N.W.2d 397.

III. There are only three matters of accounting for determination. These are charges made by Alter Company for services rendered the joint venture, the first, rental for storage of mats in the sum of $9866.66, second, service of Mr. Bernard Goldstein of Alter Company in the sum of $2562, this amount has been reduced from $5125 by the trial court, and thirdly, for unloading trucks by defendant in the amounts of $6766.65, $2214.50, $695.05, $19.71 and $18.49.

These items appear under miscellaneous expenses in an accounting of the joint venture furnished plaintiff sometime after the auction sale. Plaintiff did not actually contest these items separately until he amended his reply during trial. In so doing he states, "Such storage pending sale is a necessary incident."

The joint venture agreement provided both parties were to equally put forth their efforts toward selling and disposing of the landing mats. It also provided the sales and money were to go through defendant, Alter Company, and it was to furnish

plaintiff with a complete record giving a detailed accounting. The joint venture agreement made no provision for handling the mats. Plaintiff has testified Alter Company agreed to store the mats without charge, this is denied by Mr. Alter. We agree with the trial court this appears unreasonable on its face and conclude there was no independent oral agreement.

The landing mats when purchased were lying in a field near Camp Ellis, Illinois. It is apparent they had to be removed and stored near a railroad siding or truck facility. These circumstances create a situation where an agreement to pay for such services by the joint venture is implied. Young v. Scoville, 99 Iowa 177, 188, 68 N.W. 670; and Mondamin Bank v. Burke, 165 Iowa 711, 715-718, 147 N.W. 148.

The principal question is the reasonable value of the charges made. On this issue defendant has the burden of proof. It is the joint venturer required to account. It is in the position of selling the services of its facilities and employees to the joint venture and owes the same duty of loyalty as in a sale of merchandise or equipment to a joint venture or partnership. Wilson v. Moline, 229 Minn. 164, 38 N.W.2d 201; and Wilson v. Moline, 234 Minn. 174, 47 N.W.2d 865.

The evidence bearing on the reasonable value of the storage, unloading and personal services is not sufficient to prove an account in a proceedings solely for that purpose. Here we have these factors. The defendant furnished plaintiff with the accounting shown by plaintiff's Exhibit D. This accounting had been in plaintiff's hands prior to commencement of suit in 1957. No specific objection to these items was made until its amendment to reply during trial in 1961. A large amount of defendant's basic records have been water damaged and were unavailable. Defendant's principal witness on the charges made does not in so many words qualify as an expert. His testimony does show he has been connected with Alter Company since 1950, a period of eleven years at the time of trial, that he was familiar with the charges for storage of scrap metal paid and received by Alter Company. The testimony shows the charges were based on these charges for scrap metal and on the amounts paid for storage by the joint venture to others. The evidence is sufficient

to show 3300 tons were stored by Alter Company for the period claimed. The service was necessary. Mr. Alter testified they charged $400 per month. Mr. Goldstein testified to the use of the 10c per ton per month figure, the usual charge for scrap metal, in reaching a figure of 12c per ton per month for landing mats because of their bulk and compared the figures with the $60 per month and $10 per week for storage in Ipava. By their testimony no more than 1000 tons were stored in Ipava. The record does not fairly show more than 3300 tons were actually stored by Alter Company from May 23, 1951, to June 12, 1953, a period of 24⅔ months. Defendant has made no effort to pinpoint evidence along these lines. We think the most that defendant should be fairly entitled to charge for storage is $330 per month. This is based on the apparent cost of such storage charged at Ipava. Defendant should not receive more for such service to the joint venture than the record shows the cost would be elsewhere. The figure for storage is therefore reduced to $330 per month for 24⅔ months or $8140.

The charges for unloading cars and trucks total $9714.40. Mr. Goldstein testified they paid $2.50 per ton for loading to one Brock in Ipava and that it seemed to him they charged about $2.50 per ton to the joint venture. A charge for loading of $4 per ton totaling $1794.14 appears in the accounting to which plaintiff does not object. There is a difference between loading and unloading, but under the circumstances these transactions are similar. The unloading was necessary. It appears at least 3300 tons, the amount on hand at the time of auction, were unloaded. There is no evidence from which we can determine whether a greater amount was handled. We think the proof is sufficient to sustain the unloading of 3300 tons at $2.50 per ton, or $8250, and no more.

The 41 trips made by Mr. Goldstein to Ipava were charged at the rate of $125 per trip. Each trip took one day. The amount was reduced by one half by the trial court. This apparently on the basis Mr. Goldstein was receiving $125 per week and working two days a week. The evidence is, he was attending law school the other days of the week. On these days Mr. Goldstein also worked for Alter Company after returning from school. In

argument defendant states it was paying him $40 per day. A number of trips, how many the record does not show, were made with Mr. Crook, another Alter Company employee for whom a $25 daily charge for similar trips is not questioned here by plaintiff. Some trips were made with Mr. Alter. From the evidence before us we cannot determine the cost of the trip other than the actual wage paid to Mr. Goldstein. We think the evidence only justifies a charge of $40 per trip for the 41 trips made by Mr. Goldstein, or $1640. As tending to support our conclusion here, see Rath v. Kelly, 246 Mich. 25, 224 N.W. 377; Stephens v. Stephens, 298 Ky. 638, 183 S.W.2d 822; Siler v. Barber, Tex. Civ. App., 29 S.W.2d 829; and Schneider v. Schneider, 347 Mo. 102, 146 S.W.2d 584.

IV. In summary the above have been reduced to what the record shows was the minimum of necessary services actually performed by the defendant for the joint venture at the lowest cost fairly shown by the record in the case of storage and at the lowest figure actually paid by defendant in the case of the unloading and for Mr. Goldstein's services. Plaintiff is entitled to no less a charge and under the record defendant, with its duty to account and of loyalty, is entitled to no more.

Defendant's appeal is by our leave under rule 332, Rules of Civil Procedure, and is directed to the trial court holding it a constructive trustee and ordering it to account for all transactions concerning the subject of the joint venture. On defendant's appeal the case is reversed.

Plaintiff cross-appealed and urged only the trial court's ruling on the expenses charged by defendant. On plaintiff's appeal the case is affirmed except as modified by the reduction of the expenses as herein set out.

The parties have by stipulation agreed as to the amount of capital invested by each party. The trial court reserved the auctioneer's fee of $200, the advertising expense of $308.85 paid to Bawden Brothers, the item shown on Exhibit D as "Less refund of deposit $1200"; and the question of repayment of defendant's advance of $43,157.89 and interest thereon for future determination. None of the other items of defendant's account-

ing to plaintiff as shown by plaintiff's Exhibit D were so reserved and are by force of the trial court's decree approved.

The case is therefore reversed on defendant's appeal, modified on plaintiff's appeal, and remanded to the trial court for a determination of only the items reserved by it and for a decree in conformity herewith.

Costs are taxed 75 percent against plaintiff and 25 percent against defendant.—Reversed in part, modified in part, and remanded with directions.

All JUSTICES concur.